### LEONARD v. MARSHALL et al.

#### (Circuit Court, W. D. Missouri. May 21, 1897.)

1. EQUITABLE ASSIGNMENT—WHAT CONSTITUTES.

One procuring a loan from an agent of the lender for the purpose of discharging a debt of the same amount due by him to a third party, on executing the note and mortgage verbally directed the agent to pay over the money, when received from his principals, to such third party; and the latter, on learning of the arrangement, assented to it. *Held*, that this was an equitable assignment of the fund.

2. LACHES.

Plaintiff, through one T., made a loan to G., secured by a trust deed. When the loan became due T., who was an agent of certain eastern money lenders, engaged to procure for G. a loan from them with which to pay off plaintiff's loan. T., therefore, who was the trustee in plaintiff's trust deed, procured from him the note, in order that he might release the trust deed, so that G. could make a new mortgage to the new lenders. The trust deed was accordingly released of record, and a new note and trust deed executed by G., and forwarded by T. to his principals. The latter, instead of forwarding the full $5,000, the amount of the new loan, rendered to T. a statement showing that he owed them $2,600, consisting of two items of $1,000 and $1,600 each, and remitted him the balance, with directions to apply it, together with the $2,600, upon the loan. T. in fact owed them only $1,600, but he did not make any objection to the statement. G. had directed him, on receiving the amount of the loan from his principals, to pay it over to plaintiff; but T., without the knowledge either of his principals or of G., applied the money to his own use, continuing to pay the interest to plaintiff as if the same were coming from G., and leaving plaintiff to suppose that G. had not yet obtained the new loan. Plaintiff, although he had surrendered his note, made no effort to find out the real reason why he did not receive his money, and did not even examine the county records to discover whether his trust deed had been released. Some two years later, T. became a fugitive, and plaintiff, learning the true state of affairs, sued the eastern money lenders for the amount which they had charged against T. in the account rendered to him, and which they had not forwarded to be applied on the new loan. *Held* that, in view of plaintiff's laches, he, rather than defendants, must suffer the loss to the extent of the $1,600 actually

due from T. to defendants when they rendered him the account, but that defendants were liable for the $1,000, which in fact T. did not owe them.

This was a suit in equity by M. W. Leonard against T. W. Marshall and William Challfant, Jr., to recover the sum of $2,600, with interest thereon to March 1, 1892. The facts were as follows:

On October 16, 1885, the plaintiff, a resident of Howard county, Mo., loaned, through one J. C. Thompson, to one M. O. Green, a farmer of Pettis county, Mo., $5,000, and took his note, due in three years, secured by deed of trust, on 640 acres of Pettis county farm lands. After this note became due, Thompson suggested to Green that he could get him an eastern loan at a lower rate of interest, with which he could take up and pay plaintiff's note. Thompson for a long time had been making loans for defendants, T. W. Marshall & Co., in Pettis and adjoining counties, and had general charge of their loan business there. Green assented to this arrangement, and on July 8, 1891, Thompson, having prepared Green's application for a loan of $5,000, forwarded the same to defendants, who thereafter agreed to make the loan. Thompson prepared the note and deed of trust securing the same upon the same land on which the plaintiff's note was secured. The note was payable to the order of T. W. Marshall & Co., and the deed of trust was made to J. C. Thompson as trustee for them; and on August 1, 1891, Green executed the note and deed of trust, and delivered them to Thompson for defendants. At the same time he directed Thompson to pay plaintiff's note with the proceeds of the loan he was getting from defendants. Thompson placed the note and deed of trust with his private papers, where they remained until September 30, 1891, when he filed the deed of trust for record in the county recorder's office; but he still retained the note in his hands. On August 14, 1891, defendants wrote, inquiring of Thompson about the Green loan, to which he replied that he had the papers already executed, but was waiting for Green to make up the difference between this loan and the old loan with accrued interest. Nothing further seems to have been done in the matter until about the 25th day of February, 1892, when Thompson wrote to the plaintiff, stating that Green had secured a loan, and was ready to take up plaintiff's note, and directing plaintiff to indorse it, so that he (Thompson) could release the deed of trust, as the legal holder of the note; which plaintiff accordingly did, sending the note to Thompson for collection and remittance. Accordingly, on February 27th, Thompson released plaintiff's deed of trust, and on the same day wrote to defendants, T. W. Marshall & Co., forwarding to them all the papers connected with their Green loan, making excuses for the delay, and asking them to remit the full amount of the loan, less the commission agreed upon. To this the defendants replied, inclosing a statement of their account with Thompson, as follows:

"We credit you M. O. Green loan............................ $4,875 00
We charge you on acc't of Janney loan............ $1,000 00
On acc't of David McNair loan.................... 1,600 00
Remittance to New York.......................... 2,275 00
————— $4,875 00"

They accordingly remitted, instead of the full $5,000, less their commission, as requested by Thompson, the balance shown by this account, namely, $2,275. The McNair loan referred to in the account was a loan made by defendants through Thompson, and which had become due, and had been paid to Thompson for the defendants; and it seems that it had been understood between defendants and Thompson that he should retain the amount to be applied upon the Green loan when the transaction should be completed. In regard to the Janney loan of $1,000, charged to Thompson in this account, the facts were as follows: One McGruder owed defendants $2,000, secured by mortgage. Janney also owed defendants $2,000, and was ready to pay $1,000 thereof, and have the remainder extended. McGruder owed Janney $1,000, and an arrangement was made, and carried out through Thompson, whereby McGruder's loan was increased to $3,000, and Janney's debt was decreased by $1,000, which satisfied McGruder's debt to Janney. The result was that the defendants stood, in respect to Thompson, in the same condition as before; but they had charged Thompson with the $1,000 due from Janney, though Thompson had in fact never

received it. Thompson was an officer of the First National Bank of Sedalia, Mo., and kept therein the account of the defendants, T. W. Marshall & Co., they apparently trusting this matter entirely to him. As a matter of fact, this account was overdrawn at the time of the transactions in question, Thompson presumably having otherwise appropriated the money. He never paid the principal of the plaintiff's note, or any part of it. Some time after sending the note to Thompson for collection, plaintiff demanded the money therefor, but was informed by Thompson that Green had failed to get his loan. Plaintiff then demanded back his note, but Thompson informed him that it had been lost or misplaced, and that he would look it up soon, and send it to him. Thompson continued to pay the interest on plaintiff's note as if it were coming from Green, up to October, 1893, plaintiff supposing all the time that Green was in fact paying it, and that the note was a valid and subsisting lien on Green's real estate; and he did not learn the real facts until Thompson's bank failed, on May 4, 1894, and Thompson disappeared. Green also was ignorant of the real state of affairs. He knew that his deed of trust had been released, and supposed that Leonard had received from Thompson the amount due thereon. When the bank failed, the defendants' account was still largely overdrawn. Immediately on discovering the actual condition of affairs, plaintiff sued the receiver of the bank for the $2,275 that Thompson obtained from defendants for the purpose of the Green loan, and recovered a judgment for the same. Plaintiff, having learned that defendants had deducted the $2,600 which they claimed Thompson owed them from the amount of the Green loan, instituted this suit to recover the same, claiming that in equity it belonged to him, and was wrongfully withheld.

James T. Montgomery, for complainant.
Montgomery & Montgomery, for defendants.

PHILIPS, District Judge. The first question of importance lying at the threshold of this controversy is one of law: If it were conceded that defendants had not paid over the money on the Green loan to Thompson, what right of action would complainant have to recover the fund in defendants' hands? He could not sue at law therefor, on the ground that defendants owed Green, for the want of privity of contract. This is conceded by complainant's counsel. The only ground, therefore, upon which he can recover is that asserted in the bill and argument,—as an assignee in equity under Green. I shall not undertake to review the authorities discussing the doctrine of equitable assignments, illustrating the varying circumstances under which such assignments may or may not be sufficient. The field is broad, presenting some incongruities, and much refinement in discussions. I am content with the rule laid down in the text by Pomeroy on Equity Jurisprudence (volume 3, § 1280):

"It is an established doctrine that an equitable assignment of a specific fund in the hands of a third person creates an equitable property in such fund. If, therefore, A. has a specific fund in the hands of B., or, in other words, B., as a depositary or otherwise, holds a specific sum of money which he is bound to pay to A., and if A. agrees with C. that the money shall be paid to C., or assigns it to C., or gives to C. an order upon B. for the money, the agreement, assignment, or order creates an equitable interest or property in the fund in favor of the assignee, C.; and it is not necessary that B. should consent or promise to hold it for, or pay it to, such assignee. In order that the doctrine may apply, and that there may be an equitable assignment creating an equitable property, there must be a special fund, sum of money, or debt actually existing, or to become so in futuro, upon which the assignment may operate; and the agreement, direction for payment, or order must be, in effect, an assignment of that fund, or of some definite portion of it. The sure criterion is whether the order or direction to the drawee, if assented to by him, would

create an absolute personal indebtedness, payable by him at all events, or whether it creates an obligation only to make payment out of the particular designated fund."

—From which it is clear that it is not essential to such assignment that it should have been in writing, or characterized by any special formulary, or indicated by any set phrase or ceremony. The text is that, if A. has a specific fund in B.'s hands, "which he is bound to pay to A., and if A. agrees with C. that the money shall be paid to C., etc., the agreement, etc., creates an equitable interest or property in the fund in favor of the assignee; and it is not necessary that B. should consent or promise to hold it for, or to pay it to, such assignee." An agreement is the coming together, in accord, of two minds, on a given proposition. This may be shown by evidence, direct and indirect, as any other fact may be satisfactorily established in court. It may arise by positive expression or necessary implication. Did Green consent and intend that the money borrowed through Thompson of defendants should be paid by Thompson directly over to complainant? Thompson was to receive and apply the money. That such was Green's purpose and understanding there can be no question, and as little question that Thompson so understood the matter. It is true that when Green was critically examined and cross-examined as to the particular words employed between him and Thompson he could not repeat them, but did depose that such was the understanding. And as persuasive proof thereof he acted thereafter for a year and a half on the assumption that Thompson had received and paid the money over to complainant. And so reliant was he thereon that he never made inquiry thereof, thus signifying that he, as assignor, had no further interest in the fund.

Equity, regarding that as done which should have been done, will, in its eagerness to see that exact justice be done according to the very right and conscience of the matter, effectuate the intention and understanding of these parties. Especially should the court lean to this view where both the creditor and the claimed assignee insist that such was the agreement. Thompson, being complainant's agent to receive the money for him from Green, could bind the arrangement in favor of Leonard, when assented to, as it was, by Leonard. I do not attach much importance to the fact that Leonard did not assent thereto until after the failure of the bank and flight of Thompson, for the reason that he had no notice of the fact that the loan had ever been consummated, and he did assent thereto as soon as he was advised of the fact. This aspect of the case is only important as it affects the conduct of the defendants, and the changed relation of the parties, within that lapse of time, which will be considered hereafter.

A more serious question as to the right of complainant's recovery, in considering the relative equities between these litigants, arises out of the laches of the complainant. The defendants were entire strangers to the complainant and Green in the inception of the transaction in question. Complainant demanded, through Thompson, that Green should pay his debt to them. He authorized Thompson to

collect it, and was advised by Thompson that Green proposed to raise the required money by effecting another loan on the mortgaged land. He was also advised that, to enable Green to effect this second loan, it was necessary that the record in the recorder's office of Pettis county should show a clear title in Green. That this might be accomplished, he assigned his note against Green to Thompson, thus making Thompson the apparent owner thereof, for the express purpose of enabling him to satisfy of record the mortgage. That was done by Thompson. The legal effect of this was to notify all persons subsequently dealing with the land that this particular debt was satisfied against the property; the very object of which was to satisfy the person who should make another loan to Green that the complainant's debt was not in the way. Thompson sent on to defendants the abstract of title, showing satisfaction of the mortgage, before the loan was made by defendants to Green.

The contention of complainant's counsel that Thompson was the general agent of defendants in Pettis county, through whom they transacted in that locality the business of their loans, and therefore the defendants are bound by all the information Thompson had respecting the conduct of this particular business between Thompson and complainant, or between Thompson and Green, is wholly untenable. In effecting this particular loan, Thompson was the agent of Green, and therefore the advancement of the money by defendants to Thompson discharged them from any liability therefor to Green. Robinson v. Jarvis, 25 Mo. App. 421–427. The defendants had a right to deal with Thompson upon the assumption that complainant's debt had been taken care of by Green and Thompson. They demanded an abstract showing a clear title to the land in Green, before the loan was closed. After that they had a right, so far as complainant was concerned, to deal with Thompson as between two independent contracting parties. When they accounted with Thompson in respect of the $5,000, no person, so far as defendants were advised or concerned, had a right to complain thereof, except Green, who made no objection. As Thompson was then indebted to defendants, they had a right, Green not objecting, to settle with Thompson by paying over to him, or under his direction, the balance of the $5,000 after deducting the sums Thompson owed them. It is true, Thompson directed them to deposit the $5,000 in the New York bank, to the credit of the First National Bank of Sedalia, of which Thompson was cashier. Defendants deposited only $2,275, the balance claimed by them as due to Thompson after an accounting with him. As early as March, 1893, they rendered Thompson their account. No objection was made thereto, so far as the evidence discloses, after that, by either Thompson or Green. From that time until the failure of the Sedalia bank, and the published insolvency and flight of Thompson, in May, 1894, the defendants were left in a sense of security respecting the malfeasance of Thompson, or the fact that the complainant had not received his money. During all that time the bank and Thompson had unimpaired credit, and were responding to all demands asserted against them. So, at any time for over a year after defendants settled with

Thompson, had they been advised of complainant's claim, they could have protected themselves against loss on account of this transaction.

The question to be answered by a court of chancery is, who shall bear the loss—the defendants or the complainant—resulting from the malfeasance of Thompson? It is answered by the wholesome rule of equity that, "where one of two innocent persons must suffer by the wrong of another, the one who enables such other to commit the wrong must bear the consequences." Spraights v. Hawley, 39 N. Y. 441–448; Whittemore v. Obear, 58 Mo. 280, 286; International Bank v. German Bank, 71 Mo. 197; Cummings v. Hurd, 49 Mo. App. 140. The complainant, by transferring his note to Thompson, and investing him with the apparent ownership thereof for the express purpose of enabling him to satisfy his mortgage against Green, put it in the power of Thompson to perpetrate the fraud. Not only that, but for 18 months he left the note, indorsed over to Thompson, in his hands, with the knowledge that thereby he had clothed Thompson with the power to satisfy the deed of trust, or otherwise to use the note, without taking the precaution, although within two hours' ride of the recorder's office, to look to see if the mortgage had been satisfied; nor did he ever, during all this time, make inquiry of Green as to whether he had paid the money to Thompson. Surely he ought not, under such circumstances, to visit the loss of his supineness, and overconfidence in Thompson, upon the defendants, who dealt with Thompson upon the reasonable assumption that the complainant's debt had been cared for. The equity of the case, it seems to me, demands that the defendants in this controversy should be acquitted of any liability to the complainant as to not only the $2,275 it placed to the credit of Thompson's bank with the bank in New York (for which amount the complainant has obtained judgment against the receiver of the First National Bank of Sedalia), but also for the sums actually in Thompson's hands, owing to the defendants, and for which the defendants accounted with Thompson, as before stated.

Another question, however, arises in this connection,—as to whether Thompson in fact owed to the defendants the amount of credits so claimed by them against Thompson. Among the items charged by defendants in said accounting against Thompson was the sum of $1,000, claimed to have been collected by Thompson from one Janney, belonging to defendants. The evidence in this case shows the facts respecting this item: One McGruder owed the defendants $2,000 on a matured note, secured by mortgage on McGruder's land. Janney also owed the defendants $2,000, secured by mortgage on his land. Janney was ready to pay $1,000 on his loan, and to have the loan extended. McGruder owed Janney the sum of $1,000, and the arrangement agreed upon, and carried out through Thompson, was that McGruder's loan was increased to $3,000, and a mortgage taken on his land to the defendants to secure this $3,000 loan. Thereupon Janney's debt was decreased by the sum of $1,000, which satisfied McGruder's debt to Janney; the result of this arrangement being that defendants stood, in respect of

82 F.—26

the money they were out, and the security they then had, precisely where they were before the conventional arrangement. It was, therefore, simply a matter of bookkeeping, by which the defendants charged up to Thompson the $1,000 on Janney's account. As a matter of fact, Thompson never received the $1,000 from Janney, nor did the defendants advance to McGruder in kind. It was simply a rearrangement of the $4,000 they had loaned to Janney and McGruder; and when the new arrangement was perfected the defendants still held claims against Janney and McGruder to the extent of $4,000, satisfactorily secured by mortgages on real estate. If it was deemed necessary to charge up the $1,000 against Thompson, they should have credited him with a like increase in the McGruder debt.

It thus becomes apparent that the defendants did not, in fact, pay over to Thompson the amount of the Green loan by the sum of $1,000; and the complainant, as the equitable assignee of this fund, is entitled to a decree therefor against the defendants, unless the contention of defendants' counsel be sustained, that by reason of the allegations of the bill the complainant is precluded from asserting the right to a decree therefor. It is contended by defendants' counsel that complainant's bill avers, in effect, that Thompson did have in his hands, on account of collections made for defendants, the sums credited to him in the account rendered by defendants to Thompson. The allegations of the bill respecting this matter are that the defendants sometimes allege and pretend that they have paid the full amount of the said $5,000 loan to said Thompson, and at other times that they have paid the same to said Green; but the bill then charges the fact to be that defendants have only paid out of said loan the sum of $2,400, for which the orator makes no complaint against defendants (this having reference evidently to the sums paid by defendants to the New York bank, with commissions, etc.). The bill then proceeds in the same connection to state that "they allege that the First National Bank of Sedalia, or said J. C. Thompson, or both, were indebted to them, the said defendants, in the sum of $2,600 on account of the collection of certain notes, made either by said bank or by said Thompson," and that in remitting to said Thompson for said Green loan the defendants deducted out of the $5,000 the said $2,600. It is to be observed that the words above quoted, "they allege," evidently have reference to what defendants claimed, and, taken in its context, it ought not to be construed as an admission by the pleader that Thompson had collected the said $1,000 from Janney. And as the court, in furtherance of justice, if it were necessary, would permit the complainant to make this part of his bill clear to meet the state of the actual facts, I am not disposed, upon such a technicality, to permit the defendants to cover up, after the fashion they have attempted, the $1,000 which they should have paid over to Thompson for Green. One unfamiliar with the distress of mind into which Thompson's frauds and concealments had brought him might wonder how it was that Thompson acceded to a charge against him of this $1,000 in the account rendered by defendants. But the facts disclosed by the

depositions in this record show that the defendants had reason to suspect the integrity of Thompson, and that he was in no condition to maintain any controversy with them; and he deemed it, in his straitened condition, better to submit to this specious bookkeeping of the defendants respecting this $1,000 than to protest or resist. It results that decree is ordered against the defendants for the sum of $1,000, with interest thereon from the date of the institution of this suit.